IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


DIANNE H. DORTON, as Personal          )
Representative of the Estate of        )
RANDALL ALEXANDER DORTON,              )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )
                                       )
HENDRICK MOTORSPORTS, INC.,            )
JOHN P. TRACY, as Personal             )
Representative of the Estate of        )
RICHARD EDWARD TRACY; RICHARD M.       )
MORRISON, as Personal                  )          1:06CV431
Representative of the Estate of        )
ELIZABETH LEE MORRISON; and            )
HMS HOLDINGS LIMITED PARTNERSHIP       )
                                       )
          Defendants and               )
          Third-Party Plaintiffs,      )
                                       )
     v.                                )
                                       )
UNITED STATES OF AMERICA,              )
                                       )
          Third-Party Defendant.       )

## MEMORANDUM OPINION AND ORDER
## ON MOTION FOR NEW TRIAL

THOMAS D. SCHROEDER, District Judge.

     This case was one of several arising from the crash of a

private aircraft.  Trial occurred in phases.  By this court's

prior Order, claims by Plaintiff Dianne H. Dorton, as personal

representative of the Estate of Randall Alexander Dorton

("Dorton"), were tried to a jury in April and May 2009, and

claims by certain of the Third-Party Plaintiffs against the

United States for alleged air traffic controller fault were tried to the court from July 7 through 24, 2009.[1] Both the jury and this court found no liability.

Presently before the court is Dorton's motion for new trial in her jury trial, pursuant to Federal Rule of Civil Procedure 59. (Doc. 216.) Defendants have responded (Doc. 218), and Dorton has filed a reply (Doc. 219). The court has carefully considered all arguments raised by the parties, and the motion is ripe for resolution.

## I. STANDARD FOR NEW TRIAL

Federal Rule of Civil Procedure 59 provides that, following a jury verdict, the court may grant a new trial based on "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A court should grant a new trial if the verdict (1) "is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Knussman v. Maryland, 272 F.3d 625, 639 (4th Cir. 2001) (citations omitted). In determining the clear weight of the evidence, the court may

---

[1]    Dorton brought her own claims against the United States that were adjudicated, along with the claims of other plaintiffs whose actions were consolidated, in the bench trial. See Turner v. United States, 736 F. Supp. 2d 980 (M.D.N.C. 2010).

weigh the evidence and make credibility judgments. <u>Poynter v. Ratcliff</u>, 874 F.2d 219, 223 (4th Cir. 1989). The decision whether to grant a new trial lies in the sound discretion of the district court. <u>Knussman</u>, 272 F.3d at 639 (citing <u>Cline v. Wal-Mart Stores, Inc.</u>, 144 F.3d 294, 301 (4th Cir. 1998)).

## II. ANALYSIS

Dorton contends that a new trial should be granted on the grounds that the verdict is "against the great weight of the evidence," is based on false evidence, and would result in a miscarriage of justice. (Doc. 216 at 1.) In order to address each of these arguments, a recitation of the evidence presented at trial is in order.

This case involves claims arising out of the crash of a Beechcraft Super King Air 200 turboprop aircraft on October 24, 2004, as it attempted to land at the Martinsville, Virginia, airport (designated "MTV"). The aircraft, designated by its tail number N501RH, was owned by Hendrick Motorsports, Inc., and was operated by a corporate affiliate of the Hendrick Motorsports NASCAR teams. Though the flight was scheduled to depart the Concord, North Carolina, airport at 10:30 a.m. to allow it to arrive at MTV in time for a 1:00 p.m. race, low cloud ceilings at MTV delayed the take-off until approximately 11:56 a.m.

The pilots were Richard Edward Tracy ("Tracy") and Elizabeth Lee Morrison ("Morrison"). Tracy was a former commercial airline pilot with over 10,000 hours of experience, and Morrison had over 2,000 hours of experience. Both Tracy and Morrison were aware that approximately ten nautical miles to the northwest of the approach end of MTV runway 30[2] lay Bull Mountain, which required care in maneuvering any aircraft in its vicinity. During a briefing on the morning of the flight, the Federal Aviation Administration ("FAA") informed Tracy that Bull Mountain would be obscured by clouds.

Because of the low overcast skies, the pilots were required to execute an instrument flight rules ("IFR") approach, meaning they would be dependent upon their instruments for the approach to MTV runway 30. More specifically, they would be cleared by the air traffic controllers to execute a "localizer approach," which required the pilots to use certain instrumentation to orient the aircraft properly toward MTV runway 30 for a safe landing. The localizer approach is reflected in a document known as an "approach plate," which the pilots were required to maintain onboard and to follow in executing the approach.

_____

[2] All references to miles are to nautical miles, which are approximately 1.15 statute miles. Runways are designated by their magnetic compass heading, without the last digit (i.e., rounded to the nearest multiple of ten degrees). So an aircraft approaching MTV runway 30 does so on a compass heading of approximately 300 degrees -- in the case of MTV, 305 degrees (i.e., northwest).

In this case, the localizer approach began at a point designated "BALES," which was located five miles to the southeast of the threshold to MTV runway 30. This runway threshold is also referred to as the "missed approach point." At the missed approach point, pilots are required by 14 C.F.R. § 91.175 to determine whether they have a sufficient visual view of the runway environment and are capable of landing safely; if they do not, they are required to abort the landing and fly a designated missed approach procedure depicted on the approach plate. In this case, the missed approach procedure called for a climbing right turn. Although not designated as such on the approach plate, the climbing turn accommodates the presence of Bull Mountain approximately 10 miles past the threshold of runway 30.

The aircraft was equipped with multiple instruments designed to assist the pilots in navigating the approach to MTV, and the parties agree that the pilots were trained and expected to routinely scan them in order to fly the approach safely. First, each pilot had an Automatic Direction Finder ("ADF"). The ADF displays a needle that continuously points to a radio signal emanating from a ground beacon where BALES is located. When an aircraft passes BALES, the needle is designed to swing 180 degrees to advise the pilots that the plane is passing over BALES and is thus on course to land.

Second, the aircraft was equipped with a light and device that emits an audible tone (if turned on) that would illuminate and sound, respectively, when the aircraft passes over BALES.

Third, each pilot had a Course Deviation Indicator ("CDI"), which enabled the pilots to properly align the aircraft with the center line of the runway. If the CDI deflects fully to the left or right at any time after the aircraft passes BALES en route to land, the pilots are required to immediately implement a "missed approach."

Fourth, each pilot had Distance Measuring Equipment ("DME"), which measured the aircraft's distance from a beacon located a short distance beyond the northwest end of runway 30 (and thus six miles from BALES). The DME displays the distance to the nearest tenth of a mile. As an aircraft approaches the runway from the southeast, the mileage continually decreases; conversely, as the aircraft flies away from the runway, the DME readout continually increases. The DME assists the pilots in measuring their distance from the threshold of the runway to land safely.

Fifth, each pilot had a timer they were required to use in order to determine whether the aircraft had reached the missed approach point. The approach plate provided figures that enabled the pilots to calculate the time that should elapse

during the descent so the pilots could fly a correct descent profile and reach the missed approach point.

Sixth, the aircraft was equipped with a Global Positioning System ("GPS"). The GPS was not certified for use as a primary means of navigation on N501RH, and a placard in the cockpit reminded the pilots of this limitation. When the pilots filed their flight plan, they noted "slant golf," meaning that the plane contained the GPS.

MTV is not a controlled airport, so there is no control tower or air traffic controller provided. Rather, pilots are cleared into the airspace by regional air traffic controllers, who then terminate radar services to the aircraft.[3] This leaves the pilots responsible for determining whether they can land safely and, if not, to execute a missed approach and re-contact air traffic control. The air traffic controller's responsibility is to protect the airspace around the airport from other aircraft so as to permit the cleared aircraft the opportunity to land.

Because N501RH did not have either a flight data or voice recorder, much of what occurred in the aircraft cockpit is unknown. What is known is revealed in radar reconstruction and

---

[3] In this case, radar services were being provided by controllers at the Terminal Radar Approach Control facility maintained by the United States at the Greensboro, North Carolina, Piedmont Triad International airport.

recordings of radio transmissions with the regional air traffic controllers.

At 12:17 p.m., air traffic controllers directed N501RH to proceed directly to BALES and to enter a holding pattern (as published on the approach plate) at 4,000 feet,[4] while another plane attempted to land at MTV. At 12:21 p.m., N501RH requested a five-mile holding pattern "leg," and air traffic control responded by allowing N501RH the discretion to select either five-mile or ten-mile legs. At 12:24 p.m., while N501RH remained near its assigned altitude of 4,000 feet, air traffic control confirmed that the other plane had landed. N501RH confirmed to air traffic control that it was "established" in the holding pattern, and the controller cleared it for a localizer approach to runway 30 and directed its crew to advise when the aircraft was inbound on the approach. Under applicable regulations, the controller's clearance to land using the localizer approach also necessarily included approval to execute a missed approach or, if the pilots could keep the airport in view, a circling approach to land from the opposite direction. See 14 C.F.R. § 91.175 (2004). The clearance also authorized N501RH to execute the approach and to descend at the discretion of the pilot-in-command as long as the descent did not violate

---

[4] All altitude references are expressed in feet above mean sea level ("MSL").

the minimum altitudes set forth in the approach plate.  See id.
Thus, the descent required no further authorization from air
traffic control.

N501RH immediately acknowledged the clearance and turned
toward BALES.  Because the aircraft was headed away from BALES
when it was cleared from its hold, its turn may have resulted in
the aircraft passing near but just to the north of BALES.  Just
over two minutes after receiving clearance, the crew informed
the controller that N501RH was "established inbound," meaning
that the pilots were aware of their location inbound to land.
At 12:26:52 p.m., the controller authorized a frequency change
to MTV's UNICOM frequency[5] and directed N501RH to cancel with the
controller from the remote at MTV, i.e., report when N501RH had
landed (so the controller would be able to release the MTV
airspace for other aircraft to land).  Four seconds later,
N501RH acknowledged the frequency change.  Under federal
directives, the pilots were aware that upon the frequency change
radar services (including radar monitoring by the controllers)

_____

[5] UNICOM is a private air-ground frequency operated by the local
airport.  Thus, the switch to UNICOM permitted the aircrew to
communicate with MTV air traffic (if any) as well as service personnel
on the ground.

to N501RH would be terminated.  (See Trial Tr.[6] 4/28/09 at 75-76.[7])

Radar reconstruction reveals that N501RH passed BALES at 3,900 feet, well above the 2,600 foot minimum required by the approach plate.  The aircraft continued to fly at this altitude instead of beginning its descent, as contemplated by the approach plate.  The pilots eventually began their descent and performed an otherwise accurate descent profile (that is, descending at appropriate times to stay above federally-mandated minimum altitudes for a localizer approach during relevant segments of the descent), except that N501RH was approximately five miles off course to the northwest.  As a result, the aircraft flew over runway 30 while at 2,600 feet – the minimum descent altitude for passing over BALES.  This suggests strongly that the pilots somehow confused MTV runway 30 with BALES.

---

[6] Trial transcripts for this case were filed in the related case Dorton v. United States, Case No. 1:07CV23 (M.D.N.C.).

[7] The referenced testimony, by MTV airport manager Jason Davis, is consistent with the FAA's Aeronautical Information Manual ("AIM") with which pilots must be familiar.  See Turner, 736 F. Supp. 2d at 1001, 1003 (quoting AIM ¶ 5-4-3.b.3 ("radar service is automatically terminated . . . when [the pilot is] instructed to change to advisory frequency at uncontrolled airports")); cf. id. at 1006 (quoting Air Traffic Control Manual ¶ 5-1-13.b.2 (FAA Order 7110.65P (2004)) ("Radar service is automatically terminated and the aircraft needs [sic] not be advised of termination when . . . [a]n aircraft conducting an instrument . . . approach . . . has been instructed to change to advisory frequency")).

Evidence at trial supported the following conclusions, assuming all instruments were operating correctly and the pilots monitored them. If N501RH properly passed over BALES, the ADF needle should have swung, the blue light should have illuminated, and the audible tone should have sounded, and thereafter the ADF needle should have pointed *behind* the aircraft. The ADF would have continued to point behind the aircraft, thereby indicating to the pilots that they had already passed BALES even before the pilots began their descent. If the pilots had been monitoring the ADF prior to beginning their descent, they should have realized that BALES was already behind them and that they were not where they apparently thought they were. Defendants presented evidence, however, that N501RH may have actually passed slightly north of BALES, thus potentially preventing the aircraft from receiving one of more of these signals from the ground.

In addition, had the pilots been properly using the DME, it should have read six miles at BALES and begun to count *down* as N501RH approached MTV. A DME reading of less than six miles should have alerted the pilots that they were inside, rather than outside, BALES. Further, as the aircraft passed over the DME beacon just beyond the far end of MTV runway 30, the DME in the cockpit should have started to count *upward*. Thus, at about the time the pilots were *initiating* their descent from 2,600

feet, the DME should have begun counting *upward*, indicating that the aircraft was flying away from, and not toward, MTV.

Because Tracy and Morrison executed their descent approximately five miles off course, they overflew runway 30 while they were still in the clouds, apparently oblivious to this fact. When N501RH finally broke out beneath the clouds at approximately 1,400 feet,[8] the pilots were approaching what they should have perceived to be their missed approach point. Visibility below the clouds was at least one to two miles. They did not execute a missed approach, however, but continued to fly at approximately 1,400 feet for somewhere between two to three miles. Mark Nelson, an eyewitness in the parking lot of a church located approximately six miles past the airport, observed N501RH fly over. Mr. Nelson reported that the plane was low enough that he could see faces of individuals peering out its windows, and the aircraft's gear was up. The aircraft continued to fly for approximately one minute past the church.

At approximately 12:32:13 p.m., N501RH began to ascend and entered the clouds. At 12:33:03 p.m., Morrison called air traffic controllers and announced that they were "going missed at this time." The aircraft continued to fly straight as it ascended, never turning. Air traffic control acknowledged the

---

[8] Because altitude is recorded in MSL, N501RH was actually approximately 500 or 600 feet above the terrain.

transmission and instructed N501RH to climb and maintain 4,400 feet, but N501RH never responded. At 12:33:24 p.m., before N501RH appeared on the controller's radar, the aircraft collided with the rising terrain just short of the ridge line of Bull Mountain.

With these facts in mind, the court turns to the specific contentions raised by Dorton.

### A.  Whether the Jury Verdict is Against the Clear Weight of the Evidence

Dorton argues, as she argued to the jury, that the pilots knowingly and willfully disregarded their instruments, intentionally failed to execute a missed approach upon reaching their mistaken missed approach point, and intentionally did not execute the climbing right turn after declaring a missed approach, as required by the approach plate. Defendants respond that there was ample evidence to permit the jury to conclude that the pilots' conduct did not meet the legal standard for liability.

The parties agreed, and the court found, that Dorton's claims were governed by the law of the state of North Carolina insofar as Dorton's decedent was a co-employee of the pilots. Under North Carolina law, a heightened standard of proof is required to base liability on the conduct of a co-worker. Under Pleasant v. Johnson, 312 N.C. 710, 325 S.E.2d 244 (1985), the

13

North Carolina Supreme Court extended the intentional tort exception to the exclusivity provisions of the workers' compensation act to cases in which a co-employee acted with "willful, wanton and reckless negligence." Id. at 716, 325 S.E.2d at 249. Under Pleasant, negligence is "willful" when it consists of an "intentional failure to carry out some duty imposed by law or contract which is necessary to the safety of the person or property to which it is owed." Id. at 714, 325 S.E.2d at 248. Negligence is "wanton" or "reckless" when it consists of "an act manifesting a reckless disregard for the rights and safety of others." Id.

Under Pleasant, "willfulness and wantonness [must be] equivalent in spirit to actual intent." Id. at 715, 325 S.E.2d at 248. The North Carolina Supreme Court observed that "[t]he concept of willful, reckless and wanton negligence inhabits a twilight zone which exists somewhere between ordinary negligence and intentional injury." Id. at 714, 325 S.E.2d at 247. Noting that the state of mind of the perpetrator "lies within the penumbra of what has been referred to as 'quasi intent,'" the Court observed:

> Constructive intent to injure may also provide the mental state necessary for an intentional tort. Constructive intent to injure exists where conduct threatens the safety of others and is so reckless or manifestly indifferent to the consequences that a finding of willfulness and wantonness equivalent in

spirit to actual intent is justified. Wanton and reckless negligence gives rise to constructive intent.

Id. at 714-15, 325 S.E.2d at 247-48 (citations omitted).

In the twenty-six years since Pleasant was decided, rarely have reported opinions held that the evidence was sufficient for a Pleasant claim to be submitted to a jury. E.g., Pinckney v. Van Damme, 116 N.C. App. 139, 447 S.E.2d 825 (1994) (affirming denial of motion for judgment notwithstanding the verdict where evidence demonstrated that plaintiff stuntman's injury resulting in loss of eye was caused by defendant actor Jean Claude Van Damme's knowing efforts, including prior instances, to engage in excessive contact to make fight scenes during filming appear as authentic as possible in reckless or manifest indifference to the consequences). The difficulty of establishing a Pleasant claim is demonstrated by several cases that found that a co-employee's violation of safety regulations or company policies, even knowingly, did not make out a violation of the Pleasant standard. See, e.g., Abernathy v. Consol. Freightways Corp., 321 N.C. 236, 362 S.E.2d 559 (1987) (reversing denial of directed verdict motion made by co-employees who drove forklift that injured plaintiff and were aware that it was brakeless (and was placarded as "No Brakes") but nevertheless believed it could be stopped by engaging a foot pedal and shifting gears, which the employees had done before to stop it, as insufficient to

rise to an equivalency in spirit to actual intent to inflict injury under Pleasant); Pendergrass v. Card Care, Inc., 333 N.C. 233, 424 S.E.2d 391 (1993) (affirming Rule 12(b)(6) dismissal of case on grounds that plaintiff's allegation that his co-employees directed him to work on textile machine with knowledge that certain dangerous parts were unguarded in violation of Occupational Safety and Health Administration ("OSHA") regulations failed to show that the co-employees were so "manifestly indifferent to the consequences of" their actions that "a constructive intent to injure may be inferred"); Bruno v. Concept Fabrics, Inc., 140 N.C. App. 81, 87, 535 S.E.2d 408, 413 (2000) (affirming summary judgment for supervisor in charge of employee safety who allowed a co-employee to work on a dangerous machine despite knowledge the employee had taken prescription medication and was forbidden from operating the machinery under company policy, and finding that the supervisor's actions failed to "support an inference that he intended that plaintiff be injured or was manifestly indifferent to the consequences of her operating the picker machine"); Jones v. Willamette Indus., Inc., 120 N.C. App. 591, 593, 595-96, 463 S.E.2d 294, 296-98 (1995) (affirming summary judgment for co-employee defendants where plaintiff's decedent was killed while cleaning residue from large metal cylinder used for burning waste even though the cleaning process violated OSHA regulations

and the death was a "preventable accident"); <u>Dunleavy v. Yates</u>
<u>Constr. Co.</u>, 106 N.C. App. 146, 150, 154-56, 416 S.E.2d 193,
195, 198-99 (1992) (affirming summary judgment for co-employee
foreman where plaintiff's decedent was killed in a trench
collapse where the trench was not properly supported and the
decedent was not provided a hard hat, all in violation of OSHA
regulations, even though the foreman was arguably negligent in
not supervising every portion of the site being worked by an
inexperienced crew).

Dorton relies principally on two cases for the proposition
that a pilot's failure to continuously monitor an aircraft's
navigational instruments during IFR conditions constitutes
willful, wanton and reckless negligence. The first is <u>Koirala</u>
<u>v. Thai Airways Int'l</u>, Case Nos. C-94-2644SC, C-95-0082SC, 1996
WL 40243 (N.D. Cal. Jan. 26, 1996), <u>aff'd</u>, 126 F.3d 1205 (9th
Cir. 1997). <u>Koirala</u> was a bench trial applying the "wilful
misconduct" standard under the Warsaw Convention to the conduct
of pilots of a Thai Airways flight that crashed into the
mountains near Kathmandu, Nepal, in 1992.[9] The pilots became
distracted when their flaps would not fully deploy as they

---

[9] "Wilful misconduct" under the Warsaw Convention as applied in <u>Koirala</u>
meant that a carrier or agent must have acted either "(1) with
knowledge that its action would probably result in injury or death, or
(2) in conscious or reckless disregard of the fact that death or
injury would be the probable consequences of its action." <u>Koirala</u>,
1996 WL 40243, at *5.

prepared to land. Mistakenly executing a 360 degree (instead of 180 degree) turn, the pilots thereafter for nearly six minutes became preoccupied with addressing the flaps problem and failed to monitor any of their navigational instruments which would have alerted them to the impending danger. The aircraft slammed into a nearby mountain at 11,500 feet while traveling at 300 mph, killing all on board. The district court found that the pilots engaged in "wilful misconduct" under the Warsaw Convention, and the court of appeals upheld the conclusion as not clearly erroneous.

Dorton relies as well on In re Korean Airlines Disaster of September 1, 1983, 156 F.R.D. 18 (D.D.C. 1994) ("In re KAL"), aff'd, 52 F.3d 1122 (D.C. Cir. 1995) (per curiam), in which the court considered a motion under Federal Rule of Civil Procedure 60(b). In that case, Korean Airlines flight 007, en route from New York to Seoul, South Korea, strayed off course approximately 360 miles into Soviet airspace. Flight 007 was shot down over the Sea of Japan by Soviet military aircraft, killing all 269 persons aboard. The jury returned a verdict finding that the deaths were proximately caused by the "wilful misconduct" of the flight crew, applying the Warsaw Convention. The jury awarded punitive damages against the airline in the amount of $50 million (which was later vacated on a separate appeal). Dorton cites the case for the pilots' repeated failure to follow

fundamental and mandated navigational safety procedures which would have alerted the crew to the aircraft's deviation. Dorton argues that both Koirala and In re KAL require a finding of willful misconduct in this case based on the crew's failure to monitor their instruments, execute a missed approach upon reaching their mistaken missed approach point, and/or execute a climbing right turn once they declared a missed approach.

While Koirala and In re KAL are similar in some respects, they are not controlling here. Even assuming (without deciding) that the Pleasant standard equates to the "wilful misconduct" standard under the Warsaw Convention, the cases are distinguishable on their facts. In Koirala, the pilots failed to scan *any* of their instruments for over five minutes, totally oblivious to the fact that they were headed straight into a mountain, and the trial court's finding of "wilful misconduct" on those facts was affirmed on the deferential standard of not being "clearly erroneous." In In re KAL, the pilots failed to monitor their navigational equipment for over five hours, and the aircraft had strayed nearly 360 miles off course into Soviet airspace. Moreover, while both cases upheld a finding of liability, neither Koirala nor In Re KAL held that a contrary finding would have been against the clear weight of the evidence.

Here, there was evidence presented to the jury to permit it to reasonably find that the pilots' actions did not meet the heightened standard under <u>Pleasant</u>.  For example, unlike in <u>Koirala</u>, there was evidence that the pilots must have monitored at least some (perhaps many) of their navigational instruments during their attempt to land at MTV.  The crew reported to controllers that they were "established" in their hold and again that as they proceeded to land they were "established inbound" just inside BALES.  The transmissions from the crew constitute acknowledgements that they believed they were aware of their location (albeit mistakenly here).  (<u>See</u> Trial Tr. 4/30/09 at 107; <u>cf.</u> Trial Tr. 5/1/09 at 30-31.)  Also, there was evidence that the descent profile of N501RH matched that of a properly conducted descent, except it was displaced approximately five miles to the northwest.[10]  The jury could have reasonably concluded that the only way for N501RH to have descended properly in observation of the mandatory minimum altitudes at various points in its descent profile, as it did, was for the pilots to have monitored certain of their instruments.  (<u>See,</u>

---

[10] The approach plate provided that an aircraft passing BALES may not descend below 1,520 feet prior to reaching a DME reading of 2.8 miles, that is, until 1.8 miles from the approach end of runway 30.  At that point, the aircraft may descend further, but not below 1,340 feet (known as the "Minimum Descent Altitude" or "MDA") *unless* the pilots have the runway in sight and determine that they can land safely.

e.g., Trial Tr. 4/24/09 at 69-71, 77-80, 90-94; Trial Tr. 5/1/09 at 23-26.)

The jury could have concluded that N501RH's altitude of 2,600 feet over MTV – the altitude it should have been over BALES – and otherwise normal descent profile suggest strongly that the crew simply mistook MTV for BALES. How this may have happened is unknown. However, there was evidence that this could have occurred had the crew (in this case pilot Morrison) used the GPS during the approach, because the GPS location for MTV is set approximately at the mid-point of runway 30. (See Trial Tr. 4/27/09 at 17 (noting GPS mark for MTV about one-half mile from DME location).) The crew had noted on their flight plan that N501RH was equipped with "slant golf," meaning it had a GPS. Whether the crew actually used it in any fashion for navigation for the approach is unknown, however.[11]

Pleasant requires a manifest indifference to the consequences of one's actions such that a "constructive intent to injure may be inferred." The jury could have determined that the pilots, who were experienced, never intended to put their

---

[11] Where a GPS system is approved, it may be used as a primary method of navigation, and indeed an approach plate for MTV provided information for navigating a GPS approach. (Id. at 34-35 (discussing Jeppesen GPS runway 30 approach plate); Def. Ex. 66 (Jeppesen GPS runway 30 approach plate); see Trial Tr. 4/23/09 at 176 (GPS and terminal approach capability).) Conducting a true GPS approach, however, uses a reference point -- "ULAKE" -- located in a place different from BALES.

own lives at stake and had every motivation to land safely and were not manifestly indifferent to the consequences of their actions. See In re Air Crash near Morrisville, No. 1:95MD1084, 1997 U.S. Dist. LEXIS 21827, at *25 (M.D.N.C. Dec. 16, 1997) (noting, in granting summary judgment against a punitive damages claim, that "the crew knew that their own lives were at stake during Flight 3379, and the crew had every motivation to see that Flight 3379 arrived safely at its destination"); In re Aircraft Accident at Little Rock, 231 F. Supp. 2d 852, 880 (E.D. Ark. 2002) (in granting summary judgment on punitive damages claim which under state law required conscious indifference or otherwise reckless disregard of consequences, stating "[t]here is no evidence that [the crew] had any motive or reason to disregard their own personal safety in landing the aircraft"), aff'd, 351 F.3d 874 (8th Cir. 2003); Southeastern Aviation, Inc. v. Hurd, 355 S.W.2d 436, 447 (Tenn. 1962) ("[T]here is nothing to show such gross and wanton negligence on [the pilots'] part as to evidence conscious indifference to consequences. It must be remembered that their own lives were at stake, and they evidently expected to make a safe landing."); cf. Echols v. Zarn, Inc., 116 N.C. App. 364, 448 S.E.2d 289 (1994) (affirming grant of summary judgment against plaintiff under Pleasant for failure to demonstrate manifest indifference to the consequences where the evidence showed that the supervisor herself worked the

machine by placing her hand under the safety gate as she had instructed plaintiff), <u>aff'd</u>, 342 N.C. 184, 463 S.E.2d 228 (1995) (per curiam), <u>and abrogated in part on other grounds</u>, <u>Mickles v. Duke Power Co.</u>, 342 N.C. 103, 463 S.E.2d 206 (1995).

Dorton argues that Tracy and Morrison must have intentionally violated federal regulations designed for the safety of all aboard the aircraft. The fact that the pilots failed to execute a missed approach earlier and then failed to fully execute the missed approach procedure properly by making a climbing right turn, while constituting negligence, does not necessitate a finding that their failures were actually or constructively intentional. The fact is that Morrison did declare that N501RH was executing a missed approach, and it appears from the radar reconstruction that the crew did intend to execute a missed approach. Their failure was in not doing so sooner and not turning to the right while climbing. On this point, Defendants presented evidence that there is no precise mechanism for executing a missed approach and that pilots would not be negligent in waiting to initiate any turn until they had climbed sufficiently to avoid any potential terrain during the turn. Moreover, there was testimony that because N501RH began its climb approximately six miles beyond MTV's DME antenna, Tracy and Morrison may have mistakenly misread their DME. And, as there was ample evidence that the crew was geographically

disoriented once N501RH descended below the clouds, the jury may have simply found that the crew's actions were the result of oversight or confusion. Cf. Lunsford v. Republic Servs. of N.C., LLC, 183 N.C App. 155, 643 S.E.2d 675 (2007) (unpublished opinion) (affirming summary judgment on Pleasant claim for defendant who "lost control" of garbage truck and was attempting "to correct it" when plaintiff was injured).

In any event, no one knows what the crew was thinking, and the crew's actions were consistent with a conclusion that they believed they were in the vicinity of MTV. If the jury so determined, then the crew would have believed that Bull Mountain lay some ten miles ahead of them and was not an imminent threat at the rate of N501RH's ascent. The experts on both sides agreed that this accident is known in the field as a "controlled flight into terrain" – which means the pilots were unaware they were in any danger. (Trial Tr. 4/22/09 at 133-34; Trial Tr. 4/30/09 at 203, 206-07; Trial Tr. 5/1/09 at 34-35.) Therefore, even if the jury determined that the pilots intentionally delayed in executing the missed approach procedure in hopes of spotting the MTV airport, a finding of liability is not mandated under the heightened Pleasant standard. Cf. Regan v. Amerimark Bldg. Prods., Inc., 127 N.C. App. 225, 489 S.E.2d 421 (1997) (affirming summary judgment for supervisors under Pleasant where plaintiff suffered severe injuries when his arm got caught in

industrial equipment and supervisors knew both emergency cut-offs were inoperable and the North Carolina Department of Labor had cited the machine as a "serious violation" three months earlier for lacking its designed safety guard), aff'd, 347 N.C. 665, 496 S.E.2d 378 (1998) (per curiam).

Considering all of the above, while the evidence might support a verdict of liability, it also fairly supports a contrary verdict, given the heightened standard applicable under Pleasant. The court finds, therefore, that the verdict is not against the clear weight of the evidence.

**B. Claims of False Evidence.**

Dorton argues that Defendants presented false testimony through their piloting, radar, and aviation accident reconstruction expert, William J. Edwards ("Edwards"), that contributed to the verdict being against the "great weight" of the evidence. In her argument section of her brief, Dorton argues that this "included" testimony that the pilots (1) were not required to use the ADF on their approach, (2) properly monitored their instruments, (3) would have received a "satisfactory grade" on a check flight, and (4) executed their missed approach shortly after reaching their mistaken missed approach point. (Doc. 217 at 14.) In considering a claim of false evidence, the court should grant a new trial "where the court is reasonably well satisfied that the testimony given by a

material witness is false; that without it, a jury might have reached a different conclusion; [and] that the party seeking a new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial." Gibson v. Total Car Franchising Corp., 223 F.R.D. 265, 279 (M.D.N.C. 2004) (quoting Davis v. Jellico Cmty. Hosp., Inc., 912 F.2d 129, 133 (6th Cir. 1990)).

Dorton first claims that Edwards testified falsely that Tracy and Morrison were not required to use the ADF on approach. (Doc. 217 at 8, 14; Trial Tr. at 4/30/09 at 192.) It is noteworthy that the testimony Dorton cites was elicited by her counsel on cross-examination of Edwards and not during his direct examination by Defendants. Edwards acknowledged that Hendrick Motorsports company policy required use of the ADF on approach, and he further acknowledged that the approach plate said that ADF was required. (Trial Tr. 5/1/09 at 81-82.) Dorton's counsel pressed further by saying, "it is your testimony that the pilots weren't required to do that, is that what you are saying?" (Id. at 82.) To this Edwards gave a long response that included the statement "[t]here are times when you use it, and there are times when you don't." (Id.) His response further provided that "there is evidence that they [the N501RH pilots] were using the ADF to navigate to BALES" but added that "[t]he ADF requirement that's contained on the

26

approach plate is primarily for the purposes of a missed approach to get you back to BALES." (Id.) Edwards then stated, "[i]t is not required to identify BALES because there are several other methods used to identify BALES." (Id.) Edwards identified those other methods as DME, the marker beacon, a tone in the cockpit, and a "radial off of this VOR [indicating on the approach plate]." (Id.) He added, "[t]hat's the way we train pilots, and that's the way we test pilots." (Id.)

Edwards' testimony as to the ADF was expert *opinion*. Moreover, it was not elicited by Defendants on direct examination but by Dorton on cross-examination, even though she had previously deposed Edwards and knew or had the opportunity to learn and test his opinions. (See Doc. 217 at 9.) Dorton never objected to the testimony at trial or argued then that it was false, and, as noted, she had the opportunity to cross-examine him. Dorton was also free to present rebuttal evidence on the point and even ridiculed Edwards' testimony in this regard during closing argument. (Trial Tr. 5/4/09 at 139-40.) Under these circumstances, the court cannot say that Edwards' opinion testimony was false and, even if it were, cannot say that Dorton was unable to challenge it. Indeed, she presented her version through her own experts and fact witnesses, whom the court granted substantial leeway in testifying. Nor can the

court say that without the complained of testimony the jury may have reached a different conclusion.

Dorton also points to Edwards' testimony that the swing of the ADF needle when an aircraft passes BALES could be missed because it happens "in a split second," claiming such to be false. (Doc. 217 at 8.) The reference to a "split second" was in response to the following question on direct: "how long in your experience does it take the needle to swing if the ADF is working properly?" (Trial Tr. 4/30/09 at 228.) On cross-examination, Edwards testified that "the rate at which the needle swings is only dependent on your distance from the NDB [beacon] and how quickly you are crossing those radials. So it can go in a split second if you are very close or it can take some time if you are further away." (Trial Tr. 5/1/09 at 138.) Thus, Edwards acknowledged that the speed of the ADF needle movement depends on several factors. Dorton also concedes in her brief that she successfully debunked any notion of a "split second" movement of the needle on cross-examination. (Doc. 217 at 8.) Based on the record, the court finds that the testimony was not false and, regardless, Dorton's concern was handled through cross-examination.

Dorton argues next that Defendants presented "conclusory expert testimony" without any factual basis that the pilots were monitoring their instruments on their approach. (Doc. 217 at 8,

14.) This is not a complete recitation of the transcript. Edwards was asked on direct examination which instruments the pilots would have needed to monitor to fly their descent profile, and Edwards identified several, including the horizontal stabilizer indicator, altimeter, vertical speed indicator, turn and bank indicator, CDI, and all engine instruments. (See Trial Tr. 4/30/09 at 221-27.) Dorton complains that "no attempt was made to explain how the pilots could possibly have been monitoring their instruments while at the same time being so significantly off course." (Doc. 217 at 8.) This was the purpose of cross-examination, however, and Dorton fails to demonstrate that this opinion testimony constituted false testimony.

Dorton contends that Edwards testified falsely that Tracy and Morrison would have received a "satisfactory grade" for the manner in which they flew their approach. (Doc. 217 at 9, 14.) Again, this is an incomplete reading of the testimony. Edwards was asked whether the pilots of an aircraft flying N501RH's descent "profile" would have received a satisfactory grade, and he agreed because, as he noted, it was a "stabilized approach." (Trial Tr. 5/1/09 at 25.) Edwards' opinion was limited to the "profile" – that is, the rate of descent on approach – and not the location of the descent. Edwards made clear on his direct

29

examination that N501RH's actual flight profile was improperly displaced well beyond the MTV runway.  (Id. at 38.)

Dorton also complains about Edwards' opinion that the crew initiated a missed approach "within a reasonable period of time" and that there was no evidence they knew the airport was behind them at the time they did so.  (Doc. 217 at 9, 14.)  The former was an opinion based on interpretation of the evidence and was subject to cross-examination, and the latter was a reasonable statement insofar as the evidence demonstrated that the crew was situationally-disoriented.

Finally, Dorton contends that Defendants "used several tactics in an attempt to minimize the distance the pilots flew N501RH after reach[ing] their missed approach point."  (Doc. 217 at 9.)  First, Dorton claims that Edwards changed his testimony from that in his deposition and expert report by stating at trial that N501RH was six (rather than five, as noted in his report and deposition) miles off course.  (Id.)  Second, she claims that Edwards testified that there was no evidence the GPS was turned on (as opposed to in deposition blaming the flight's course deviation on the crew's use of the GPS).  (Id.)  Third, she claims that Edwards "presented incomprehensible expert testimony" that the pilots thought the missed approach point was at six miles after, and not before, the DME beacon.  (Id.)  Each of these arguments is without merit.

As to the distance issue, Dorton argues that Edwards opined at trial that the aircraft was off course six miles, whereas he put it at five miles in his deposition. It is noteworthy that the "missed approach point" at the threshold of runway 30 is separated from the DME beacon located just beyond the far end of the runway by exactly one mile, thus accounting for possible testimony of five or six miles, depending on the precise question. More importantly here, while not pointing to any portion of the transcript where Edwards opined that the aircraft was off course by six miles, Dorton cites in support of her argument only Edwards' concession during cross-examination that Morrison's use of the GPS could have caused the aircraft to be off by five miles. (Doc. 217 at 9 (citing Trial Tr. 5/1/09 at 70).) Thus, Dorton's point was ultimately established during the trial. In any event, Edwards' testimony was not false. Rather, Dorton's argument is at best a claim that she was surprised by the alleged change in testimony, yet she has not demonstrated prejudice.

Moreover, as to the GPS, Edwards opined on direct examination that the crew was not flying a "GPS approach." This was evident, he stated, because a GPS approach keyed off a waypoint designated "ULAKE" located in a different place than BALES, required higher mandatory minimum altitudes inconsistent with N501RH's flight profile, and would have put the aircraft in

the clouds when it was spotted by Nelson below the clouds). (Trial Tr. 4/30/09 at 234-36.) Edwards also stated that the destruction of all instrumentation in the crash eliminated the possibility of obtaining any objective proof the GPS was turned on. (Trial Tr. 4/30/09 at 200.) Dorton argues that by so testifying, Edwards changed his opinion that the GPS was used because, she contends, he stated it was not even turned on. Edwards never said the GPS was not turned on, however. He merely conceded that, because the GPS was destroyed in the crash, there was no evidence it was turned on (or off, for that matter). (Id.) And while opining that the crew did not conduct a "GPS approach," Edwards never recanted his opinion that the crew may have consulted the GPS during the approach. Indeed, when Dorton's counsel cross-examined Edwards with his deposition transcript (in which he stated, "I think the likelihood is she's [pilot Morrison] looking at the GPS. It's already sequenced to Martinsville. She thinks it's still on BALES and she goes, it's so many miles to BALES."), Edwards agreed that it was his opinion that Morrison was likely using the GPS as a backup during N501RH's approach and simply misread the instrument. (Trial Tr. 5/1/09 at 45, 64, 66-71, 76.) Consequently, Edwards' trial testimony is not inconsistent with his earlier opinion that Morrison consulted the GPS as a backup and did not constitute false evidence.

Finally, Dorton disagrees with Defendants' attempt to explain how the pilots may have mistakenly misread the DME. Dorton does not cite to any portion of the record for her contention that there was false evidence, and the argument fails for that reason alone. Suffice it to say that Defendants argued that no one knows what the crew did and why, and Defendants posited that the pilots may have erroneously expected the DME to count up to "6," instead of counting down to "0" or "1," as the aircraft approached the missed approach point. To the extent offered through any witness, this was opinion, and not fact, testimony, and given the evidence on how the DME worked, it was up to the jurors whether to believe the pilots may have misread the DME in this fashion or whether they were even monitoring it. In any event, this testimony was available to be challenged during cross-examination and through rebuttal evidence.

In sum, Dorton has failed to demonstrate that a new trial should be granted based on false evidence.

**C.   Claim of Miscarriage of Justice.**

Finally, Dorton argues that the bifurcation of the third-party case against the United States from the jury trial enabled Defendants to "exploit an 'empty chair' defense," such that evidence of air traffic controller conduct "severely prejudiced Plaintiff's case." (Doc. 217 at 14.) Dorton argues that a retrial should be granted because the claims against the United

States have subsequently been dismissed, see Turner, 736 F. Supp. 2d 980, thus preventing Defendants from shifting blame to the government in a retrial.

These arguments are unpersuasive. First, the United States is present in this case only because Defendants brought them in via a third-party complaint, and by statute claims against the United States are tried to the court (without a jury). (See Doc. 1 (Notice of Removal of Civil Action); Doc. 1-3 (Ex. A to Doc. 1 (Answer, Motions, and Third-Party Complaint, Case No. 05 CVS 1606, at 16-19 (N.C. Super. Ct., Lincoln Cnty.))); Doc. 8 (Answer, Affirmative Defenses and Counterclaim of Third-Party Defendant United States of America); Doc. 14-2 (Order substituting party defendants); see also 28 U.S.C. §§ 1346, 2402.) Had Defendants not sued the United States (that is, had the case proceeded as Dorton originally filed it), trial would have proceeded without the government, and Defendants would have been free to try the same "empty chair" defense against the government under circumstances where Dorton would have no ability to complain.[12]

Second, Dorton herself had separate claims against the United States which blamed the air traffic controllers for the

---

[12] To the extent Dorton is really arguing that had all claims been tried together (presumably with the jury rendering an advisory verdict on the claims against the government) she would have benefitted from the government's witnesses blaming the pilots, she was never entitled to such a trial.

crash. Her claims were filed in <u>Dorton v. United States</u>, Case No. 1:07CV23 (M.D.N.C.), and were tried to the court with all other consolidated similar claims against the United States.[13] <u>See</u> <u>Turner</u>, 736 F. Supp. 2d 980. It is hard for her to contend she was prejudiced by Defendants' pointing to air traffic controller fault when she herself was advancing the same contentions elsewhere.

Third, at trial in the present case Defendants sought to exploit Dorton's dual lawsuits by offering into evidence the factual allegations of her complaint against the United States in <u>Dorton v. United States</u>, Case No. 1:07CV23, as well as testimony of one of her experts in that case who blamed the crash on the controllers. Dorton objected, and the court sustained that objection. (<u>See, e.g.,</u> Trial Tr. 5/1/09 at 9-10.) The court also rejected Defendants' proposed jury instructions titled "Plaintiff's Admission that Government

---

[13] Multiple lawsuits were filed involving this crash, and the court consolidated five of them for discovery and for trial, bifurcating the jury claims for trial first in the interest of judicial efficiency. This preserved the rights of Dorton and the pilots' estates to a jury trial and preserved the right of the United States to have the claims against it adjudicated in a bench trial. (<u>See</u> Doc. 151 filed in <u>Dorton v. United States</u>, Case No. 1:07CV23 (M.D.N.C.) (Final Order Regarding Consolidation and Bifurcation (Apr. 21, 2009)).) The claims against the United States were tried under a lesser standard of proof than the <u>Pleasant</u> standard in this case. That the court reached different interpretations of the evidence, particularly as to its finding of pilot fault, does not render the jury's rejection of pilot fault under the heightened <u>Pleasant</u> standard erroneous. Indeed, the jury was free to reach its own conclusions based on proper evidence.

Conduct was the Cause of the Accident," which sought to achieve the same effect. (Trial Tr. 5/1/09 at 168-75; Trial Tr. 5/4/09 at 40; see Trial Tr. 5/1/09 at 5-14 (addressing related issues); see also Trial Tr. 4/24/09 at 161-66 (sustaining objections to cross-examination of Dorton's expert regarding air traffic control).)[14]    Thus, Dorton benefitted from procedures that prevented the Defendants from arguing to the jury her potentially-conflicting claims.

Consequently, it is difficult to understand how Dorton could be prejudiced by Defendants' pointing to air traffic controller fault under these circumstances.

The fact that Dorton failed to prevail in her claim against the United States (based on controller fault) in her separate lawsuit does not provide a basis for granting a new trial so she can, as she argues, "focus on those who were responsible for the flight and who flew N501RH into the side of the mountain: the pilots." (Doc. 217 at 14.)    Dorton had a full and fair opportunity to present her case to a jury.  The evidence was conflicting and was sufficient to support a finding of either liability or no liability.  The decision was for the jury, which was persuaded that the crew's actions were not "willful, wanton and reckless" within the meaning of Pleasant.

--------

[14] Indeed, over Defendants' objection, the court even permitted Dorton to elicit testimony on direct from a fact witness that tended to negate any controller fault. (See Trial Tr. 4/28/09 at 75-76.)

## III. CONCLUSION

For the reasons set forth above, the motion for new trial by Dianne H. Dorton, as personal representative of the estate of Randall Alexander Dorton (Doc. 216), is DENIED.

                                          /s/   Thomas D. Schroeder
                                    United States District Judge

June 1, 2011